The ESTATE CONSTRUCTION COMPANY; Maureen Dowd Patterson; Robert Brown Patterson, Plaintiffs–Appellants,

v.

MILLER & SMITH HOLDING COMPANY, INCORPORATED; Providence Savings & Loan Association, S.A.; Keystone Financial Services Corporation, Incorporated; Gordon V. Smith; Bruce Smith; Miller & Smith Homes, Incorporated; Miller & Smith Homes of Maryland, Incorporated; Miller & Smith Land, Incorporated; Miller & Smith Industrial, Incorporated; Miller & Smith Construction Company, Incorporated; Everett M. Calloway; Fagelson, Schonberger, Payne and Dichmeister; Robert A. Payne; Eugene Schonberger; Richard North; Robert Jacobi; Stuart J. Bell; Ronald S. Faett; Henry A. Thomas; Dallas O. Berry; Jack Tarquini; Linda Guild; Jack B. Conner; Jack B. Conner & Associates, Incorporated; N. Vernon Cockrell; David G. Speck, Defendants–Appellees.

No. 93–1110.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 27, 1993.

Decided Jan. 13, 1994.

---

Arnold Bruce Podgorsky, Wright & Talisman, P.C., Washington, DC, argued, (Carrie L. Bumgarner, Wright & Talisman, P.C., on brief), for plaintiffs-appellants.

Allen Scott Rugg, Kutak, Rock, John Tremain May, Washington, DC, argued, for defendants-appellees.

Before NIEMEYER and HAMILTON, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

HAMILTON, Circuit Judge:

Estate Construction Company, Inc. (the Company) and its sole stockholders Maureen Dowd Patterson and Robert Brown Patterson (collectively the Pattersons) appeal the (October 30, 1992 and December 18, 1992) orders of the district court dismissing their claims for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). The Pattersons appeal only the dismissal of their state law fraudulent conveyance claim, Va.Code Ann. § 55–80, and their Sherman Act claim, 15 U.S.C. § 1. For the reasons stated herein, we affirm the district court's dismissal of the claims.

### I

In 1986, the Pattersons, who were real estate developers, purchased seventy-six acres of land in Delaplane, Fauquier County, Virginia. In 1988, they purchased an adjacent 371 acre tract. We refer to both parcels jointly as "the Property." Through their wholly owned company, Estate Construction Company, Inc., the Pattersons intended to renovate a Revolutionary War era residence [1]

---

1. The residence itself was called Delaplane Manor.

and construct five other homes on the Property.

Defendant Providence Savings and Loan Association, F.A. (Providence) is a chartered savings association under the Home Owners' Loan Act, 12 U.S.C. § 1461 et seq. Providence is wholly owned by defendant Miller & Smith Holding Company (MS Holding), a holding company which also owns numerous other companies engaged in real estate acquisitions, financing, development, and sales. MS Holding is principally owned and managed by the individual defendant Gordon v. Smith.[2]

In August 1988, Providence made an acquisition and construction loan to the Pattersons in the amount of $7,557,600 (the Loan). The Loan was secured by the Property pursuant to a deed of trust and a security agreement.[3]

By July 1989, the Pattersons defaulted on the Loan. Notifying them by letter dated July 25, 1989 that the Loan was in default, Providence set forth the several events of default as defined in the loan documents.[4] The letter also informed the Pattersons that they could avoid acceleration of the debt by curing the events of default within thirty days, pursuant to the terms of the loan agreement. After failing to cure the events of default, the Pattersons filed for bankruptcy on October 12, 1989, in the United States Bankruptcy Court for the Eastern District of Virginia seeking to reorganize their affairs under Chapter 11 of the United States Bankruptcy Code.

In December 1990, Providence moved for relief from the automatic stay which had attached upon the Pattersons' declaration of bankruptcy. On September 26, 1991, the bankruptcy court conducted a hearing on Providence's motion seeking an order granting it relief from the automatic stay. By order dated September 27, 1991, the bankruptcy court granted Providence's motion and lifted the stay with respect to Providence's secured claim.[5] In granting Providence's motion, the bankruptcy court determined that the Pattersons had no equity in the Property. The bankruptcy judge valued the Property at $6.3 million.[6] He then determined that the amount of debt was $6.3 million[7] with a cost of completion of $500,000. Thus, according to the bankruptcy court, the total debt was $6.8 million.

After receiving approval from the bankruptcy court to sell the Property, Providence directed Calloway, the substitute trustee un-

---

**2.** In addition to Providence, there were twenty-six other defendants named in the complaint, including Providence's officers, directors, employees, attorneys, appraisers, shareholders, and corporate affiliates of Providence's shareholders. Eugene Schonberger, Robert Payne, and their law firm of Fagelson, Schonberger, Payne and Dichmeister were also named as defendants. Everett M. Calloway (Calloway), the substitute trustee under the deed of trust, was also a defendant.

**3.** This was a second lien. The Pattersons' property was already subject to a first lien of approximately $650,000 in favor of Continental Federal Savings Bank (Continental).

**4.** The record reveals four grounds for default:
(1) Altering or adding to work performed without prior written consent of Providence.
(2) Execution of a subordinate deed of trust on the Property in favor of Riggs National Bank (Riggs) without the prior written consent of Providence.
(3) Allowance of mechanics liens to be placed on the Property.
(4) Submission to Providence of evidence that Borrower had insufficient funds to complete the project.

**5.** The Pattersons chose not to appeal this order.

**6.** In preparation for the hearing on the motion for relief from the automatic stay, defendant Jack Conner, an appraiser for Providence, valued the Property at $4.2 million. Because the bankruptcy court believed this estimate to be "somewhat low," it raised the appraisal by fifty percent, to $6.3 million. (J.A. 111).

**7.** This figure included two other deeds of trust which had been placed on the Property. Continental had a first deed of trust on Delaplane Manor (the house itself). Although the original amount of that loan was around $650,000, by September 1991, the amount of the debt outstanding amounted to approximately $830,000. Providence had a second deed of trust on Delaplane Manor and a first deed of trust on all the other Property. At the time of the hearing on the motion for relief from the automatic stay, the total debt outstanding on the loan from Providence was approximately $5.1 million. Finally, Riggs National Bank, not a party hereto, had a second lien on all the Property in the amount of approximately $330,000.

der the deed of trust, to proceed with a foreclosure sale of the Property. Calloway advertised the sale of the Property by auction in strict accordance with the deed of trust and applicable law. Attempting to prevent the sale, the Pattersons filed suit on November 5, 1991, in the Circuit Court for Fauquier County, Virginia (state court), seeking a preliminary injunction barring the foreclosure. The state court refused to enjoin the foreclosure sale.

On November 7, 1991, Calloway conducted the foreclosure sale. Providence purchased the Property for $3.3 million cash, plus the assumption of a first deed of trust in favor of Continental securing debt in the original principal amount of $650,000 and which bore a total balance due in November 1991 of greater than $850,000. Therefore, the total purchase price paid by Providence was $4.15 million.

On October 6, 1992, the Pattersons filed a twenty-count complaint in the United States District Court for the Eastern District of Virginia and named as defendants Providence and some twenty-six other entities and individuals, including its officers, directors, employees, attorneys, appraisers, shareholders and corporate affiliates of its shareholders. Subject matter jurisdiction was predicated upon claims against all defendants under § 1 of the Sherman Act, 15 U.S.C. § 1, and claims against certain defendants under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. The complaint included state law claims over which the district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367. One of the state law claims alleged fraudulent conveyance under Va.Code Ann. § 55–80.[8]

On October 20, 1992, Providence filed a motion to dismiss count one of the complaint, the state law fraudulent conveyance claim. By order dated October 30, 1992, the district court dismissed that claim. The district court reasoned that the bankruptcy court, in lifting the stay, had concluded that the Pat-

tersons had no equity in the Property; this matter, the district court stated, had been fully litigated in the bankruptcy court. The district court also held that § 55–80 did not apply to procedurally conforming foreclosure sales. Finally, it determined that no fraud had been adequately pleaded or shown to sustain a cause of action under § 55–80 against Providence.

On December 7, 1992, the district court denied the Pattersons' motion for reconsideration of its order of October 30, 1992.

On November 16, 1992, the defendants filed a motion to dismiss all remaining counts of the complaint. By order dated December 18, 1992, the district court granted the motion and dismissed the two federal claims, Fed.R.Civ.P. 12(b)(6). Because this dismissal extinguished the district court's supplemental jurisdiction over the remaining state claims, they were dismissed without prejudice. Although the district court granted the Pattersons ten days in which to file an amended complaint, no amended complaint was filed.

The Pattersons appeal the district court's dismissal of their § 55–80 fraudulent conveyance claim for failure to state a claim upon which relief can be granted. The Pattersons also appeal the district court's Rule 12(b)(6) dismissal of the claim which was based upon § 1 of the Sherman Act.[9]

On December 18, 1992, the Pattersons refiled in the Circuit Court for Fairfax County, Virginia, the same complaint, minus only the Sherman Act and RICO claims, that had been dismissed by the district court. That action was dismissed.

## II

The standard of review of a Rule 12(b)(6) dismissal is *de novo*. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992). This court will construe factual allegations in the nonmoving party's

---

**8.** Although the Sherman Act claim was against all defendants, the fraudulent foreclosure claim was only against Providence itself and Calloway, the substitute trustee under the deed of trust.

**9.** The district court dismissed the Sherman Act claim because it found that there was not a sufficient allegation of a conspiracy.

favor and will treat them as true, but is not so bound with respect to the complaint's legal conclusions. *Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 978 F.2d 140, 142 (4th Cir.1992). We will affirm a dismissal for failure to state a claim only if it appears that "the plaintiffs would not be entitled to relief under any facts which could be proved in support of their claim." *Schatz*, 943 F.2d at 489.

### III

Section 55–80 of the Virginia Code provides:

Void Fraudulent Acts; Bona fide Purchasers Not Affected.—

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or *other persons of or from what they are or may be lawfully entitled to* shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Historically, this section of the Code has provided protection to creditors fraudulently deprived of their interest in property. *Christian v. Gray Endowment*, 33 F.2d 759, 760 (4th Cir.1929) (holding that the predecessor to § 55–80 "makes void as to creditors whose debts were then in existence a voluntary conveyance"); *Springfield Furniture, Inc. v. Manson*, 145 B.R. 520 (Bankr.E.D.Va. 1992) (providing transactions made with intent to defraud *creditors* may be set aside); *Johnston Memorial Hospital v. Hess*, 44 B.R. 598, 600 (W.D.Va.1984) ("A fraudulent

transfer is void, as to creditors, under Virginia law."); *Colonial Investment Co., Inc. v. Cherrydale Cement Block Co., Inc.*, 194 Va. 454, 73 S.E.2d 419, 422 (1952) ("Code § 55–80 provides that every conveyance made with intent to hinder, delay or defraud creditors, shall be void, not only as to existing creditors, but as to purchasers for value with notice of such fraudulent intent.").

No Virginia cases have allowed a debtor to bring an action under § 55–80 to set aside a conveyance resulting from a foreclosure sale.[10] Only two "other persons," besides creditors, have come within the meaning of the statute: first, spouses who are granted rights upon desertion have been found to be "other persons" protected by § 55–80 against the fraudulent transfers of the deserting spouse. *Crowder v. Crowder*, 125 Va. 80, 99 S.E. 746, 747 (1919). The second class of "other persons" is comprised of individuals who intend to bring a tort suit against a debtor who, in turn, attempts to thwart recovery by fraudulently transferring his assets. *Bruce v. Dean*, 149 Va. 39, 140 S.E. 277 (1927).

The Pattersons proffer several arguments to show they can use § 55–80. We consider each in turn.

### A

■ Without citing any authority, the Pattersons argue that the plain meaning of the language of § 55–80 bestows upon them the right to proceed under § 55–80 as a protected "other person."

The Pattersons' interpretation of the statute is unconvincing. First, they are not in the two classes of "other persons" allowed to proceed under this clause. In addition, rules of statutory construction counsel against accepting the Pattersons' argument. The Supreme Court of Virginia has dictated in interpreting statutes that general words following

---

**10.** We question whether § 55–80 even applies to procedurally conforming foreclosure sales. Section 55–80 has never been used to attack a foreclosure sale. In addition, Virginia provides other comprehensive avenues of attack for debtors seeking to set aside foreclosure sales: the deeds of trust themselves; an entire article of the Virginia Code, Va.Code Ann. §§ 55–58 to 55–66.6; and the common law. It is beyond comprehension why the Pattersons chose not to pursue relief under one of the above avenues. In light of our discussion in Parts IIIA and IIIB, however, we need not resolve whether § 55–80 applies to procedurally conforming foreclosure sales.

more specific words in a statute "are to be restricted in their meaning to a sense analogous to the less general, more particular words." *Martin v. Commonwealth*, 224 Va. 298, 295 S.E.2d 890, 892 (1982). Applying this rule to § 55–80, the more general provision for "other persons" is qualified by the preceding, more particular provision for "creditors" and "purchasers." Therefore, only "creditors" and "purchasers," or perhaps others similarly situated, can be "other persons" within the meaning of § 55–80.

■ Even if the Pattersons could fit within the definition of "other persons," they would have to show some claim or interest that would "lawfully entitle" them to the Property under the statute. Resolution of this question requires us to determine whether the bankruptcy court erred in determining that the Pattersons had no equity interest in the Property.

■ Under 11 U.S.C. § 362, when a bankruptcy petition is filed, the automatic stay provisions take immediate effect. Section 362(d) allows a bankruptcy court to lift the stay with respect to particular claims if the debtor has no equity in the collateral and the collateral is not necessary to an effective reorganization of the debtor. Hearings to determine whether the stay should be lifted are meant to be summary in character. Thus, as the district court held, counterclaims such as fraud are not precluded later if not raised at this stage. *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1232 (7th Cir.1990).

■ To determine if there is equity in the property, the bankruptcy court must determine the following: (1) the value of the real estate, and (2) the amount of debt encumbering the property. If the debt is greater than or equal to the value of the realty, the stay may be properly lifted. *Id.* See *Matter of Sutton*, 904 F.2d 327 (5th

Cir.1990). Property valuations in bankruptcy are "determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Vitreous Steel*, 911 F.2d at 1232. We have noted that "estimates of value made during bankruptcy proceedings are 'binding only for the purposes of the specific hearing and ... [d]o not have a *res judicata* effect' in subsequent hearings." *In re Snowshoe, Inc.*, 789 F.2d 1085, 1088–89 (4th Cir.1986) (citations omitted). Accordingly, valuation is a question of fact, and can be overturned on appeal only if clearly erroneous. *In re Midway Partners*, 995 F.2d 490, 493 (4th Cir.1993). In other words, to set aside a valuation of equity in the property, there must be a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The Pattersons argue that the bankruptcy court's no equity determination is erroneous because of events between the time of the lift-stay hearing and the foreclosure sale.[11] Despite the Pattersons' arguments, we conclude that the bankruptcy court's finding of no equity is not clearly erroneous.

Mr. Conner, an appraiser for Providence, valued the Property at $4.2 million in September 1991, the month of the lift-stay hearing.[12] Finding this estimate to be "somewhat low," the bankruptcy judge increased the value of the Property to $6.3 million. The bankruptcy court determined that the total debt on the Property was $6.3 million. The cost of completion was found to be $500,000. Thus, there was $6.8 million in debt and $6.3 million in value. From these facts, the bankruptcy court found that no equity existed in the Property. The bankruptcy court also considered several other factors before making its determination: the length of time the Property had been on the market—two and a half years—and proposed plans to build a

---

11. The Pattersons allege that in October 1991, after the lift-stay determination, they identified a significant potential buyer who intended to purchase merely a portion of the Property for $3 million. They contend that this prospect was "less developed" (Appellant's Br. at 14) at the time of the lift-stay hearing.

12. Over a year before the lift-stay hearing, in August 1989, Donald S. Boucher, Providence's first appraiser, valued the Property at $7,824,500 with a cost of $375,000 to complete. A construction slow down occurred in the next few months. It is not shown what effect this had on the value of the Property.

golf course on the Property.[13] In addition, the bankruptcy court noted that the Pattersons admitted they had no money to complete the project.

In light of the fact that the bankruptcy court took all the above factors into account and the fact that it *increased* the Property valuation, its determination cannot be characterized as clearly erroneous. The bankruptcy court's finding that the Pattersons had no equity in the Property does not leave us with a "definite and firm conviction that a mistake has been committed." *Id.* Without any equity, the Pattersons had no legally protectible interest. Consequently, even if § 55–80 applied to debtors, the Pattersons do not fit within the statute.

**B**

■ Finally, the Pattersons rely on 11 U.S.C. § 548 [14] to argue that a foreclosure sale can produce an actionable fraudulent conveyance. They argue that cases interpreting § 548 allow such an action. *See In re Madrid*, 21 B.R. 424 (9th Cir.1982), *aff'd*, 725 F.2d 1197 (9th Cir.), *cert. denied*, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984); *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980). We disagree.

Unlike § 55–80, 11 U.S.C. § 548 explicitly includes foreclosure sales as transfers which may be construed as "fraudulent", 11 U.S.C. § 101(54). However, although § 548 specifically provides for the avoidance of transfers for "less than a reasonably equivalent value," it cannot be enforced by a debtor. In addition, but perhaps most importantly, § 548 has been held to apply only "to transfers within one year *prior* to bankruptcy." *In re Hood*, 92 B.R. 648, 654 (Bankr.E.D.Va.),

*aff'd*, 92 B.R. 656 (E.D.Va.1988) (emphasis added). In contrast, the transfers in the instant case occurred after bankruptcy. Consequently, we find no support for the Pattersons' interpretation of § 548.

**IV**

■ Section 1 of the Sherman Antitrust Act provides in pertinent part that:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

■ To prove a violation of the Act, a plaintiff must establish two elements: (1) There must be at least two persons acting in concert, and (2) the restraint complained of must constitute an unreasonable restraint on interstate trade or commerce. *See Oksanon v. Page Memorial Hosp.*, 945 F.2d 696, 702 (4th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992).

■ When confronted with a motion to dismiss a Sherman Act § 1 complaint pursuant to Fed.R.Civ.P. 12(b)(6), we must determine whether "allegations covering all the elements that comprise the theory for relief" have been stated as required. *United States v. Employing Plasterers Ass'n*, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954); *Municipal Utilities Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1501 (11th Cir.1991) ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified."). Moreover, the allegations must be stated in

---

**13.** Although the Pattersons argue that, at the time of the lift-stay hearing, the golf course plans were not definite enough for the bankruptcy court to study them extensively, as pleaded in the complaint, in January 1990, the Pattersons obtained the requisite zoning permit to construct a golf course. By August 1991, they had secured a commitment of some sort from a golf course developer. In other words, the Pattersons' golf course venture was not conceived in the short time between the lift-stay order and the foreclosure sale, and the value of the Property as a golf course *was* considered by the bankruptcy court.

**14.** Section 548 provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

terms that are neither vague nor conclusory. *Reynolds Metals Co. v. Columbia Gas Sys. Co., Inc.,* 669 F.Supp. 744, 750 (E.D.Va.1987). A mere allegation that "the defendants violated the antitrust laws as to a particular plaintiff and commodity" is insufficient to survive a Rule 12(b)(6) motion. *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 179 (3d Cir.1988) (quoting *Klebanow v. New York Produce Exch.,* 344 F.2d 294, 299 (2d Cir.1965)). Although we will assume that the plaintiffs can prove the facts that they allege in their complaint, "it is not, however, proper to assume that plaintiffs can prove facts that they have not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983).

In *National Constructors Ass'n v. National Electrical Contractors Ass'n,* 498 F.Supp. 510, 528 (D.Md.1980), *modified on other grounds,* 678 F.2d 492 (4th Cir.), *reh'g denied,* 689 F.2d 1199 (4th Cir.1982), *cert. dismissed,* 463 U.S. 1233, 104 S.Ct. 26, 77 L.Ed.2d 1449 (1983), we held that, in order to adequately allege an antitrust conspiracy, the pleader must "provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place." *Id.* Dismissal of a " 'bare bones' allegation of antitrust conspiracy without any supporting facts is appropriate...." *Pepsico,* 836 F.2d at 180 (quoting *Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972)). To allege sufficiently a restraint of trade, an antitrust plaintiff must establish a connection with interstate commerce. This connection may be shown in either of two ways: "by demonstrating that the alleged anticompetitive conduct occurred in interstate commerce, or by showing that the conduct, though wholly intrastate, had a substantial effect on interstate commerce." *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 395 (4th Cir.1974). In the latter instance, the applicable test is whether "the allegations in the complaint, if proven, could show that the conspiracy resulted in 'unreasonable burdens on the free and uninterrupted flow' of goods and services in interstate commerce." *Hospital Bldg. Co. v. Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) (citations omitted). *See Ballard v. Blue Shield of Southern W.Va., Inc.,* 543 F.2d 1075 (4th Cir.1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977).

The Pattersons argue that they have sufficiently alleged all the elements of an antitrust claim. We disagree.

First, they fail to provide any factual support for their allegations that a conspiracy existed.[15] The complaint here lacks completely any allegations of communications, meetings, or other means through which one might infer the existence of a conspiracy. Nor does it provide any "details of the time, place and alleged effect of the conspiracy." *National Constructors Ass'n,* 498 F.Supp. at 528. The Pattersons' complaint amounts only to "bare bone[d]" allegations of a conspiracy without any supporting facts. *See Heart Disease,* 463 F.2d at 100.

Although the Pattersons rely on numerous conspiracy cases for the proposition that such claims should not be dismissed lightly, *see, e.g., In re Mid–Atlantic Toyota Antitrust Litigation,* 525 F.Supp. 1265, 1280 (D.Md.), *modified on other grounds,* 541 F.Supp. 62 (D.Md.1981), *aff'd,* 704 F.2d 125 (4th Cir.

---

15. In the complaint, the facts upon which the Pattersons base their allegation of a Sherman Act violation read as follows:

Providence combined and/or conspired with the Miller & Smith defendants, Gordon V. Smith, Calloway, Conner, Jack B. Conner Associates, Inc. and others to restrain trade unreasonably in the real estate development business in the Washington, D.C. metropolitan area by combining and/or conspiring to deprive the Pattersons of The Property, cause The Property to be sold in foreclosure at a price that would leave the Pattersons with no assets, and otherwise to drive them and Estate Construction out of the real estate development business in the Washington, D.C. metropolitan area. The combination and/or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market. The objects and conduct of the combination and/or conspiracy were illegal.

(J.A. 39–40).

1983), these cases are all factually distinguishable from the instant case. In particular, the *Mid–Atlantic* case involved a plaintiff who had carefully documented a series of meetings that the defendant had attended. In his allegations, the plaintiff included the persons in attendance at the meetings, the topics discussed, and the impact these meetings had on the alleged conspiracy to restrain price competition. *Id.* at 1281. In contrast, the Pattersons include none of the above information in their complaint.

Further, the Pattersons fail to state how Providence's actions constitute a restraint of trade. In the instant case, there is a lack of any allegation of the market power of Providence to restrain trade. *See Oksanon,* 945 F.2d at 702. The Pattersons declare only that "Providence ... conspired ... to restrain trade unreasonably...." (J.A. 39). Nor do the Pattersons even hint at any effect on interstate commerce as is required by the Sherman Act. *See Hosp. Bldg. Co.,* 425 U.S. at 738, 96 S.Ct. at 1849. The complaint contains only allegations which are both "vague" and "conclusory." *See Reynolds Metals,* 669 F.Supp. at 750. In effect, the Pattersons merely reiterate mechanically the words of the Sherman Act without providing any "sufficient facts so that each element of the alleged antitrust violation can be identified." *Alabama Power Co.,* 934 F.2d at 1501.

■ Finally, the Pattersons contend that dismissal should be granted sparingly in "complex antitrust litigation." *Carpenters Local Union No. 1846 v. Pratt–Farnsworth,* 690 F.2d 489, 529–30 (5th Cir.1982), *reh'g denied,* 696 F.2d 996 (5th Cir.), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). They argue that this principle requires us to reverse the 12(b)(6) dismissal of the Sherman Act claim in the instant proceeding. This argument is without merit because the instant case does not entail "complex antitrust litigation." At issue is a single real estate foreclosure. Therefore, the Pattersons' complaint simply fails to meet the requirements necessary to survive a Rule 12(b)(6) motion to dismiss their Sherman Act claim.

## V

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED.*